Docket No. 95409–Agenda 9–November 2003.

JUANITA SULLIVAN, Indiv. and as Special Adm’r of the Estate of Burns Sullivan, Deceased, Appellant, v. EDWARD HOSPITAL 
et al.
, Appellees.

Opinion filed February 5, 2004.

JUSTICE FREEMAN delivered the opinion of the court:

Plaintiff, Juanita Sullivan, individually and as special administrator of the estate of Burns Sullivan (Burns), brought a medical malpractice action in the circuit court of Du Page County. Plaintiff named as defendants Edward Hospital (the hospital) and Dr. Amelia Conte-Russian. Plaintiff claimed that the hospital, through one of its nurses, and Dr. Conte-Russian were negligent in the care and treatment of Burns. The trial court entered a directed verdict for the hospital after plaintiff’s only medical expert was ruled incompetent to testify as to the standard of care for the nursing profession. The trial court subsequently entered judgment on a jury verdict in favor of Dr. Conte-Russian.

The appellate court affirmed. 335 Ill. App. 3d 265. We allowed plaintiff’s petition for leave to appeal (177 Ill. 2d R. 315(a)), and now affirm the appellate court.

BACKGROUND

The record reveals the following pertinent facts. In March 1995, Burns suffered a second stroke, which resulted in partial paralysis to his right side, impairing his ability to walk independently. Also as a result of the stroke, Burns could not speak, but could understand others and respond with physical gestures. Since March 1995, Dr. Conte-Russian, a general internist, had been Burns’ regular treating physician.

On November 1, 1997, Burns, then 74 years old, was admitted to the hospital for treatment of a urinary tract infection. While at the hospital, Dr. Conte-Russian was Burns’ primary care physician. The hospital categorized a patient’s risk of falling between two levels. A patient who has no impairments of any kind is characterized as a level I fall risk. A patient who has any physical or mental impairments that increase the risk of falling is characterized as level II. Because of Burns’ history of partial paralysis, he was characterized as level II.

On the evening of November 2, 1997, nurse Carrie Lewis was Burns’ primary nurse. Burns had been in his bed, equipped with four side rails, all of which were raised. Between 7 p.m. and 9:30 p.m., nurse Lewis went into Burns’ room and found Burns attempting to get out of bed through the side rails. After each of the first two occurrences, nurse Lewis found Burns to be alert, oriented, and able to understand her instructions to stay in bed. After the third occasion, Burns still appeared alert and oriented. However, nurse Lewis became concerned because of Burns’ failure to follow instructions and because Burns now appeared to be agitated. Nurse Lewis was concerned that Burns might again attempt to get out of bed and that he could fall if he did so.

Based on these concerns, nurse Lewis telephoned Dr. Conte-Russian at approximately 9:30 p.m. and asked the doctor to order a “posey vest” to restrain Burns to his bed. A posey vest is used to restrain a patient by placing the vest on the patient and then tying the vest straps to the bed. Dr. Conte-Russian advised nurse Lewis that a posey vest might result in Burns becoming even more agitated. Rather than using a physical restraint, Dr. Conte-Russian ordered the administration of the drug Ativan to calm Burns and help him sleep. Dr. Conte-Russian prescribed a very small dosage and left it to nurse Lewis’ discretion to administer more Ativan if needed.

At approximately 10 p.m., nurse Lewis administered to Burns one milligram of Ativan, which was expected to last for at least two hours. Between 10 p.m. and midnight, nurse Lewis and a nurse’s aide checked on Burns approximately every half hour. By 10:30 p.m. Burns was asleep; he was sleeping at each half-hour check. At approximately 12:05 a.m., a nurse’s aide walked past Burns’ room and looked inside; Burns appeared to be sleeping. At 12:10 a.m., a monitor technician heard a noise in the area of Burns’ room and so informed nurse Lewis. Upon receiving this report, nurse Lewis ran to Burns’ room and found him on the floor with his head bleeding from a cut above his left eye. Apparently, Burns had attempted to get up from his bed and walk; however, he fell and struck his head on the hospital room floor. As a result of the fall, Burns developed a subdural hematoma, for which he received treatment. At the request of his family, Burns was subsequently transferred to another hospital.

On November 6, 1998, plaintiff and Burns filed a two-count complaint against the hospital and Dr. Conte-Russian. The complaint alleged that the hospital, through nurse Lewis, and Dr. Conte-Russian, failed to properly monitor, medicate, or restrain Burns. In count I, Burns sought damages for injuries proximately caused by defendants’ negligence. In count II, plaintiff sought damages for loss of consortium. In September 1999, Burns died of a third stroke, which was unrelated to plaintiff’s allegations of negligence. On December 28, 1999, Burns’ death was formally reported to the trial court; plaintiff was appointed special administrator of Burns’ estate and substituted as the sole plaintiff.

At trial, plaintiff attempted to establish the hospital’s liability vicariously through the actions of nurse Lewis. Plaintiff called Dr. William Barnhart to testify as her medical expert. Dr. Barnhart is a board-certified physician specializing in internal medicine and has substantial experience in observing and working with physicians and nurses in the area of patient fall protection. Plaintiff intended for Dr. Barnhart to testify to the applicable standards of care for physicians and nurses, and the failure of both Dr. Conte-Russian and nurse Lewis to meet their respective standards of care.

Dr. Barnhart testified as to the standard of care for a licensed nurse and the instances in which nurse Lewis deviated from the standard of care. According to Dr. Barnhart, one such instance included nurse Lewis’ failure to properly communicate Burns’ condition to Dr. Conte-Russian during their phone conversation. The trial court found that plaintiff did not properly disclose Dr. Barnhart’s opinion on this issue during pretrial discovery, in violation of Supreme Court Rule 213(g) (177 Ill. 2d R. 213(g)). Therefore, the trial court struck the testimony relating to nurse Lewis’ communications with Dr. Conte-Russian.

According to Dr. Barnhart, nurse Lewis deviated from the standard of care for a licensed nurse also by her failure to adhere to proper nursing procedures in the care and treatment of a patient. Dr. Barnhart opined that nurse Lewis, after having failed to receive Dr. Conte-Russian’s approval to use a posey vest on Burns, should have gone up the nursing chain of command to pursue her concerns that Burns would attempt to get out of bed; that she should have provided for an alternative to the posey vest to protect against the risk of a fall; and that nurse Lewis should have had a sitter in Burns’ room, or should have moved Burns’ bed to an area where Burns could have received constant supervision. At the close of plaintiff’s case, the trial court struck this testimony on the grounds that a physician is incompetent to testify to the standard of care placed upon a licensed nurse.

Dr. Barnhart was plaintiff’s only medical expert as to the standard of care for the nursing profession. After the trial court ruled that Dr. Barnhart was incompetent to testify as to that standard, the court granted the hospital’s motion for a directed verdict. Thereafter, the jury returned a verdict in favor of Dr. Conte-Russian and the trial court entered judgment thereon. The appellate court affirmed. 335 Ill. App. 3d 265.

This court allowed plaintiff’s petition for leave to appeal. 177 Ill. 2d R. 315(a). We subsequently granted the Illinois Trial Lawyers Association leave to submit an 
amicus curiae
 brief in support of plaintiff. We also granted the American Association of Nurse Attorneys leave to submit an 
amicus curiae
 brief in support of the hospital. 155 Ill. 2d R. 345. We will refer to additional pertinent facts as they relate to the issues plaintiff raises before this court.

ANALYSIS

I. Dr. Barnhart’s Testimony

Plaintiff contends that the trial court erred in striking, as a discovery sanction, Dr. Barnhart’s testimony relating to nurse Lewis’ communications with Dr. Conte-Russian. Plaintiff also contends that the trial court erred in striking Dr. Barnhart’s testimony relating to the standard of care for the nursing profession and, consequently, entering a directed verdict in favor of the hospital.

A. 
Discovery Violation

During pretrial discovery, plaintiff submitted a disclosure pursuant to Supreme Court Rule 213 (177 Ill. 2d R. 213), which disclosed the names and addresses of plaintiff’s witnesses and “the subject of their testimony.” This disclosure included Dr. Barnhart’s name and address, and the following description of his anticipated testimony:

“It is anticipated that Dr. Barnhart will testify that it is his opinion that Dr. Conte[-]Russian and Edward Hospital deviated from the accepted standards of medical care by disregarding Mr. Burns Sullivan’s status as a level II fall risk suffered from cognitive impairment and inability to understand directions and was found trying to climb out of bed on three prior occasions even though he suffered from Hemi-paralysis. He will testify that Dr. Conte-Russian and the Edward Hospital staff should have restrained Mr. Sullivan in bed so that he could not get out. Further, he will testify that the attempt to sedate Mr. Sullivan by issuing medication as opposed to restraints was not properly performed. He will also testify that it is his opinion that Mr. Sullivan was not properly monitored during sedation despite his inability to understand direction and physical impairments. He will also testify that in his opinion Mr. Burns Sullivan’s injuries were sustained as a result of medical negligence.

Dr. Barnhart will testify that in his opinion, Dr. Conte-Russian, after having been advised of Mr. Sullivan’s three prior attempts to get out of bed and remove his IV[,] should have ordered restraints for Mr. Sullivan. He will testify that in his opinion Dr. Conte-Russian and the Edward Hospital medical staff should have ordered restraints for Mr. Sullivan. That in his opinion, Dr. Conte-Russian and the Edward Hospital medical staff should have monitored Mr. Sullivan more frequently after the decision not to use restraints was made. That as a result of Dr. Conte-Russian’s decision not to properly restrain Mr. Sullivan, he fell out of bed and sustained brain injury including a subdural hematoma.”

At trial, Dr. Barnhart’s testimony reflected this disclosure. However, he also testified that one instance where nurse Lewis deviated from the standard of care for professional nurses was her failure to adequately communicate Burns’ condition to Dr. Conte-Russian during their phone conversation.

At the close of Dr. Barnhart’s testimony, the hospital moved to strike that portion of his testimony relating to nurse Lewis’ communication of Burns’ condition to Dr. Conte-Russian. Plaintiff conceded that Dr. Barnhart’s specific opinion regarding nurse Lewis’ failure to adequately communicate with Dr. Conte-Russian was not included in plaintiff’s Rule 213 disclosure. The trial court granted the hospital’s motion to strike this testimony.

This cause was tried prior to the amendment of Rule 213 effective July 1, 2002, so we will refer to its preamendment version. Supreme Court Rule 213(g) requires that, upon written interrogatory, a party 
must
 disclose the subject matter, conclusions, opinions, qualifications, and all reports of a witness who will offer any opinion testimony. 177 Ill. 2d R. 213(g). Further, Supreme Court Rule 213(i) imposes on each party a continuing duty to inform the opponent of new or additional information whenever such information becomes known to the party. 177 Ill. 2d R. 213(i). The Rule 213 disclosure requirements are mandatory and subject to strict compliance by the parties. 
Seef v. Ingalls Memorial Hospital
, 311 Ill. App. 3d 7, 21 (1999); 
Warrender v. Millsop
, 304 Ill. App. 3d 260, 265 (1999). The admission of evidence pursuant to Rule 213 is within the sound discretion of the trial court, and the court’s ruling will not be disturbed absent an abuse of that discretion. 
Susnis v. Radfar
, 317 Ill. App. 3d 817, 828 (2000); 
Seef
, 311 Ill. App. 3d at 22.

As noted, plaintiff concedes that Dr. Barnhart’s specific opinion regarding nurse Lewis’ failure to adequately communicate Burns’ condition to Dr. Conte-Russian was not included in plaintiff’s Rule 213 disclosure. However, plaintiff argues that the “gist” of Dr. Barnhart’s trial testimony regarding nurse Lewis’ telephone conversation with Dr. Conte-Russian was an “elaboration” or a “logical corollary” of, or “effectively” implicated, plaintiff’s Rule 213 disclosure.

The trial court did not accept this argument, and neither do we. As the trial court reasoned, “you have to drop down to specifics.” Rule 213 permits litigants to rely on the disclosed opinions of opposing experts and to construct their trial strategy accordingly. 
Firstar Bank of Illinois v. Peirce
, 306 Ill. App. 3d 525, 532 (1999). The supreme court rules represent this court’s best efforts to manage the complex and important process of discovery. One of the purposes of Rule 213 is to avoid surprise. 177 Ill. 2d R. 213(g), Committee Comments. To allow either side to ignore Rule 213’s plain language defeats its purpose and encourages tactical gamesmanship. 
Department of Transportation v. Crull
, 294 Ill. App. 3d 531, 537 (1998). Our appellate court has stated:

“ ‘Rule 213 establishes more exacting standards regarding disclosure than did Supreme Court Rule 220 ***, which formerly governed expert witnesses. Trial courts should be more reluctant under Rule 213 than they were under former Rule 220 (1) to permit the parties to deviate from the strict disclosure requirements, or (2) not to impose severe sanctions when such deviations occur. Indeed, we believe one of the reasons for new Rule 213 was the need to require stricter adherence to disclosure requirements.’ ” 
Susnis
, 317 Ill. App. 3d at 828-29, quoting 
Crull
, 294 Ill. App. 3d at 538-39.

We agree. Given this stricter standard of compliance, we hold that the trial court did not abuse its discretion in finding that plaintiff violated Rule 213(g). See 
Susnis
, 317 Ill. App. 3d at 829.

Plaintiff further argues that even if Dr. Barnhart’s testimony constituted a discovery violation, the extreme remedy of striking the testimony constituted an abuse of the trial court’s discretion. We disagree. “ ‘Where a party fails to comply with the provisions of Rule 213, a court should not hesitate sanctioning the party, as Rule 213 demands strict compliance.’ ” 
Peirce
, 306 Ill. App. 3d at 533, quoting 
Warrender
, 304 Ill. App. 3d at 268. In determining whether the exclusion of a witness is a proper sanction for nondisclosure, a court must consider the following factors: (1) the surprise to the adverse party; (2) the prejudicial effect of the testimony; (3) the nature of the testimony; (4) the diligence of the adverse party; (5) the timely objection to the testimony; and (6) the good faith of the party calling the witness. The decision whether or not to impose sanctions lies within the sound discretion of the trial court, and that decision will not be reversed absent an abuse of discretion. 
Warrender
, 304 Ill. App. 3d at 268; 
Ashpole v. Brunswick Bowling & Billiards Corp.
, 297 Ill. App. 3d 725, 727 (1998).

The record shows that, regarding the first factor, the hospital was clearly surprised by Dr. Barnhart’s testimony. Plaintiff concedes that the Rule 213(g) disclosure did not contain the opinion to which Dr. Barnhart testified. Further, nowhere in his deposition does Dr. Barnhart suggest or imply that nurse Lewis failed to communicate appropriately with Dr. Conte-Russian and that this failure proximately caused Burns’ fall.

Regarding the second and third factors, the nature of the testimony and its prejudicial effect are manifest. Dr. Barnhart testified regarding an instance of how the hospital deviated from the standard of care for nurses. This was a theory of negligence of which the hospital should have been informed. Regarding the fourth through the sixth factors, the record shows that the hospital was diligent in sending its Rule 213 interrogatories to plaintiff; that the hospital timely objected to the contested testimony; and that this lapse in an otherwise detailed summary of Dr. Barnhart’s anticipated testimony does not indicate good faith.

The purpose behind Rule 213 is to avoid surprise and to discourage tactical gamesmanship. “Rule 213 brings to a trial a degree of certainty and predictability that furthers the administration of justice. The rule should be enforced by trial judges.” 
Peirce
, 306 Ill. App. 3d at 536. We cannot say that the trial court abused its discretion in striking this portion of Dr. Barnhart’s testimony. See 
Susnis
, 317 Ill. App. 3d at 829 (finding no abuse of discretion when trial court bars expert physician testimony after party fails to make Rule 213 disclosure of testimony regarding the relevant standard of care).

B. 
Nursing Standard of Care

Plaintiff also contends that the trial court erred in striking Dr. Barnhart’s testimony relating to the standard of care for the nursing profession and, consequently, entering a directed verdict in favor of the hospital. “In directing a verdict, the trial court determines 
as a matter of law
 that there are no evidentiary facts out of which the jury may construe the necessary fact essential to recovery.” (Emphasis added.) 
Jones v. O’Young
, 154 Ill. 2d 39, 47 (1992). Accordingly, our review is 
de novo
.

This court has explained the requirement of expert medical testimony in a medical malpractice action as follows:

“In a negligence medical malpractice case, the burden is on the plaintiff to prove the following elements of a cause of action: the proper standard of care against which the defendant physician’s conduct is measured; an unskilled or negligent failure to comply with the applicable standard; and a resulting injury proximately caused by the physician’s want of skill or care. [Citations.] Unless the physician’s negligence is so grossly apparent or the treatment so common as to be within the everyday knowledge of a layperson, expert medical testimony is required to establish the standard of care and the defendant physician’s deviation from that standard.” 
Purtill v. Hess
, 111 Ill. 2d 229, 241-42 (1986).

Accord 
Dolan v. Galluzzo
, 77 Ill. 2d 279, 282 (1979).

In this case, the trial court ruled that Dr. Barnhart was incompetent to testify as to the standard of care for the nursing profession and nurse Lewis’ deviations therefrom. The appellate court upheld the trial court’s ruling. 335 Ill. App. 3d at 269-72. In 
Jones
, 154 Ill. 2d at 43, this court summarized the test of an expert physician’s competency to testify:

“In 
Purtill v. Hess
 (1986), 111 Ill. 2d 229, this court articulated the requirements necessary to demonstrate an expert physician’s qualifications and competency to testify. First, the physician must be a licensed member of the school of medicine about which he proposes to testify. (
Purtill
, 111 Ill. 2d at 242-43, citing 
Dolan v. Galluzzo
 (1979), 77 Ill. 2d 279.) Second, ‘the expert witness must show that he is familiar with the methods, procedures, and treatments ordinarily observed by other physicians, in either the defendant physician’s community or a similar community.’ (
Purtill
, 111 Ill. 2d at 243.) Once the foundational requirements have been met, the trial court has the discretion to determine whether a physician is qualified and competent to state his opinion as an expert regarding the standard of care. 
Purtill
, 111 Ill. 2d at 243.”

If the expert physician fails to satisfy either of these foundational requirements, “the trial court must disallow the expert’s testimony.” 
Jones
, 154 Ill. 2d at 44.

Dolan
 established the first requirement, 
i.e.
, that a health-care expert witness must be a licensed member of the school of medicine about which the expert proposes to testify. 
Dolan
 explained that there are different systems or schools of medicine with varying tenets and practices, and that testing the care and skill of a practitioner of one school of medicine by the opinion of a practitioner of another school would result in inequities. The practitioner of a particular school of medicine is entitled to have his or her conduct tested by the standards of that school. 
Dolan
, 77 Ill. 2d at 283 (and authorities cited therein).

This court in 
Dolan
 further observed:

“Illinois statutes [citations] provide for the regulation of practitioners of medicine and surgery, physical therapy, nursing, pharmacy, dental surgery, podiatry, optometry, etc. This is a clear expression by the legislature of public policy to recognize and regulate various schools of medicine. The various acts regulating the health professions [citations] provide for different training, and regulate the treatment each profession may offer. *** We simply are not disposed to provide for what, in effect, may result in a higher standard of care when the legislature, by recognizing various schools of medicine, has not done so. To do so would not only be unfair *** , but it would also assume that science and medicine have achieved a universal standard of treatment of disease or injury. Such is not the case. In its wisdom, the legislature has recognized a fundamental tenet of contemporary life: no one person, group or school has yet succeeded in abstracting a universal medical method from the many changing methods used in science and medicine.” 
Dolan
, 77 Ill. 2d at 284.

Accordingly, the 
Dolan
 court held that “in order to testify as an expert on the standard of care in a given school of medicine, the witness must be licensed therein.” 
Dolan
, 77 Ill. 2d at 285.

Plaintiff argues that Illinois law no longer holds that a health professional expert witness must always be a licensed member of the school of medicine about which the expert proposes to testify. In support of her argument, plaintiff cites the following from 
Jones
:

“By hearing evidence on the expert’s qualifications and comparing the medical problem and the type of treatment in the case to the experience and background of the expert, the trial court can evaluate whether the witness has demonstrated a sufficient familiarity with the standard of care practiced in the case. The foundational requirements provide the trial court with the information necessary to determine whether an expert has expertise in dealing with the plaintiff’s medical problem and treatment. 
Whether the expert is qualified to testify is not dependent on whether he is a member of the same specialty or subspecialty as the defendant but, rather, whether the allegations of negligence concern matters within his knowledge and observation.
” (Emphasis added.) 
Jones
, 154 Ill. 2d at 43.

Based on the italicized sentence, plaintiff argues that 
Jones
 “retreats from any rigid, formalistic rule” that a health professional expert witness must be a licensed member of the school of medicine about which the expert proposes to testify.

We cannot accept this argument. 
Jones
 clearly reaffirms this court’s decision in 
Purtill
 describing 
two
 foundational requirements: that the health-care expert witness must be a licensed member of the school of medicine about which the expert proposes to testify; and that the expert must be familiar with the methods, procedures, and treatments ordinarily observed by other health-care providers in either the defendant’s community or a similar community. Indeed, the very next sentences in 
Jones
 following the italicized sentence upon which plaintiff relies state: “If the plaintiff fails to satisfy either of the foundational requirements of 
Purtill
, the trial court must disallow the expert’s testimony. (
Purtill
, 111 Ill. 2d at 244.) The requirements are a threshold beneath which the plaintiff cannot fall without failing to sustain the allegations of his complaint.” 
Jones
, 154 Ill. 2d at 44. It is only 
after
 determining that both foundational requirements are satisfied that the court proceeds to evaluate whether the allegations of negligence concern matters within the expert’s knowledge and observation. Instead of retreating from the license requirement, 
Jones
 clearly reaffirms that a plaintiff must satisfy both requirements. 
Jones
, 154 Ill. 2d at 44, citing 
Purtill
, 111 Ill. 2d at 244.

Plaintiff similarly points to language in 
Gill v. Foster
, 157 Ill. 2d 304 (1993), in arguing that Dr. Barnhart’s lack of licensure in the nursing profession should have gone only to the weight of his testimony and not its admissibility. Plaintiff misreads 
Gill
. In that case, the trial court barred the plaintiff’s expert, a licensed general surgeon, from testifying that the defendant, a licensed radiologist, deviated from the standard of care. 
Gill
, 157 Ill. 2d at 315-16. The plaintiff in 
Gill
 argued that his expert was licensed to practice medicine in all of its branches and, therefore, the expert’s testimony should have been admitted, with his qualifications going to the weight of his opinion. This court agreed with the plaintiff; however, only after finding that the plaintiff had satisfied the licensing requirement. 
Gill
, 157 Ill. 2d at 317. We cited to 
Purtill
 for its three-step analysis: the two foundational requirements of licensure and familiarity, and the discretionary requirement of competency. 
Gill
, 157 Ill. 2d at 316-17. When this court ruled that the plaintiff’s expert could testify, it was in the context of the trial court’s discretion to determine whether the physician was qualified and competent to state his opinion regarding the standard of care. 
Gill
, 157 Ill. 2d at 317. This court was not discussing whether the plaintiff’s expert satisfied the licensing requirement. Far from overruling 
Dolan
 and its progeny, 
Gill
 expressly upheld 
Purtill
’s three-step analysis. Clearly, 
Gill
 and 
Jones
 do not stand for the proposition that this court has disregarded, or should disregard, the licensing requirement first established in 
Dolan
.

Plaintiff next contends that the appellate court failed to consider section 2–622 of the Code of Civil Procedure (735 ILCS 5/2–622 (West 2000)), enacted in 1985, subsequent to 
Dolan
. Section 2–622 provides that in any medical malpractice action, the plaintiff’s attorney must attach to the complaint an affidavit stating that the plaintiff has consulted with a health professional in whose opinion there is a “reasonable and meritorious cause” for the filing of the action. The plaintiff must file a written report, attached to the affidavit, prepared by that health professional indicating the basis for his determination. The section specifically provides:

“If the affidavit is filed as to a defendant who is a physician licensed to treat human ailments without the use of drugs or medicines and without operative surgery, a dentist, a podiatrist, or a psychologist, or a naprapath, the written report must be from a health professional licensed in the same profession, with the same class of license, as the defendant. For affidavits filed as to all other defendants, the written report must be from a physician licensed to practice medicine in all its branches.” 735 ILCS 5/2–622(a)(1) (West 2000).

Plaintiff asserts that section 2–622 evinces a legislative intent that physicians are competent to testify about the standard of care for the nursing profession.

We cannot accept this contention. The written health professional report required by section 2–622(a)(1) is a pleading requirement designed to reduce the number of frivolous medical malpractice lawsuits at an early stage before litigation expenses mount. 
DeLuna v. St. Elizabeth’s Hospital
, 147 Ill. 2d 57, 65 (1992). The health professional’s report establishes only that the plaintiff has a meritorious claim and, therefore, reasonable grounds for pursuing the action. The requirements of section 2–622 do not rise to the level of substantive elements of a claim for medical malpractice. 
Gulley v. Noy
, 316 Ill. App. 3d 861, 864 (2000); 
Mueller v. North Suburban Clinic, Ltd.
, 299 Ill. App. 3d 568, 573 (1998). The report constitutes only a threshold opinion, based on a health professional’s overview of the case. The health professional’s report constitutes only “an advisory opinion.” 
McAlister v. Schick
, 147 Ill. 2d 84, 93 (1992). Because the purpose of section 2–622 is to eliminate frivolous lawsuits at the pleading stage, the statute has no bearing on the type of evidence relied upon at trial. 
Lyons v. Hasbro Industries, Inc.
, 156 Ill. App. 3d 649, 655 (1987). Further, the fact that 
Jones
 and 
Gill
, which clearly uphold 
Dolan
’s license requirement, were decided subsequent to the enactment of section 2–622 belies any tension between the statute and this court’s precedent.

Plaintiff next cites 
Wingo v. Rockford Memorial Hospital
, 292 Ill. App. 3d 896 (1997), in support of her argument against the requirement that a health-care expert witness must be licensed in the school of medicine of which the expert proposes to testify. Plaintiff contends that if 
Wingo
 is applied to this case, Dr. Barnhart should be allowed to testify to the standard of care applicable to nurse Lewis.

In 
Wingo
, three physician expert witnesses testified that a nurse deviated from the applicable nursing standard of care by failing to properly communicate the condition of a patient to the treating physician. The physicians opined that the nurse’s deviation from the standard of care resulted in a baby being born with brain damage. 
Wingo
, 292 Ill. App. 3d at 903-04.

The court in 
Wingo
 distinguished that case from this court’s precedent and held that the license requirement of 
Dolan
 did not apply:

“We find that the facts of the instant case do not fit within the license requirement of 
Dolan
 or 
Jones
. Those cases indicate that the reason for the rule is to prevent a higher standard of care being imposed upon the defendant and to ensure that the testifying expert has expertise in dealing with the patient’s medical problem and treatment and that the allegations of negligence are within the expert’s knowledge and observation. Those concerns have not been sacrificed here. In the instant case, the allegations of negligence against nurse Welden did not concern a nursing procedure but, rather, related to what a nurse is required to communicate to a physician about what transpired since the physician last saw the patient. As such the allegations of negligence do not concern an area of medicine about which there would be a different standard between physician and another school of medicine. Furthermore, it was established that the allegations of negligence were well within the testifying doctors’ knowledge and experience. We believe that a physician should be entitled to testify about what he or she is entitled to rely upon in the area of communication from a nurse in the context of an obstetrical team rendering care to a patient in a hospital.” 
Wingo
, 292 Ill. App. 3d at 906.

Accordingly, the court held that no error occurred in allowing the physicians to testify as to the applicable nursing standard of care in that case. 
Wingo
, 292 Ill. App. 3d at 906.

The appellate court in this case correctly reasoned that 
Wingo
 does not apply. In this case, the trial court struck Dr. Barnhart’s testimony regarding nurse Lewis’ communication with Dr. Conte-Russian as a sanction for violating Rule 213(g). Thus, the precise factual scenario of 
Wingo
 is not present. Dr. Barnhart’s remaining opinion testimony related to nursing procedures. 335 Ill. App. 3d at 271. In distinguishing 
Wingo
 from this case, the appellate court did not discuss the merits of 
Wingo
, and neither do we. The present case falls squarely within the license requirement of 
Dolan
 and its progeny.

Accordingly, what remains for us is to apply 
Dolan
’s license requirement for health-care expert witnesses to the remainder of Dr. Barnhart’s testimony. As noted, Dr. Barnhart testified that nurse Lewis failed to adhere to proper nursing procedures. He opined that nurse Lewis should have pursued her concerns that Burns was a fall risk by going up the nursing chain of command; that she should have provided for an alternative to the posey vest; and that she should have provided for constant supervision.

We agree with the trial and appellate courts that, based on 
Dolan
, Dr. Barnhart was not competent to testify regarding the standard of care for the nursing profession and nurse Lewis’ deviations therefrom. 
Dolan
 specifically included the nursing profession in discussing its rationale for the license requirement. This court acknowledged that the legislature established nursing as a unique school of medicine. 
Dolan
, 77 Ill. 2d at 284. Further, the dissent in 
Dolan
 lends support to the conclusion that 
Dolan
’s licensing requirement includes the nursing profession. The dissent stated: “Under [this] holding a physician would be unable to testify to nursing standards of care even though nurses operated under [the physician’s] supervision or to testify to standards for midwives, and this because the physician was not licensed as a nurse or a midwife.” 
Dolan
, 77 Ill. 2d at 286 (Ward, J., dissenting, joined by Goldenhersh, C.J.). Clearly, this exact issue was contemplated by this court in 
Dolan
, which unequivocally required that a health-care expert witness must be a licensed member of the school of medicine about which the expert testifies.

We note that 
amicus
 Illinois Trial Lawyers Association expressly agrees with the 
Dolan
 dissent and contends that the license requirement should not be a threshold test. The Trial Lawyers Association posits: “There is nothing which a nurse can do which a doctor cannot do.” To be sure, this supposition is generally accepted. 
Amicus
 American Association of Nurse Attorneys (AANA) concedes that in many jurisdictions physicians have been allowed to testify as to the nursing standard of care. See, 
e.g.
, 
Paris v. Kreitz
, 75 N.C. App. 365, 380, 331 S.E.2d 234, 245 (1985) (noting that “physicians are clearly acceptable experts with regard to *** nurses”); 
Goff v. Doctors General Hospital
, 166 Cal. App. 2d 314, 319-20, 333 P.2d 29, 33 (1958) (reasoning that “surely, a qualified doctor would know what was standard procedure for nurses to follow”).

However, the proposition that “[t]here is nothing which a nurse can do which a doctor cannot do” presumes a universal standard of treatment among physicians and nurses. 
Dolan
 expressly rejected this assumption. 
Dolan
, 77 Ill. 2d at 284 (rejecting the assumption “that science and medicine have achieved a universal standard of treatment of disease or injury”). AANA persuasively reasons:

“A physician, who is not a nurse, is no more qualified to offer expert, opinion testimony as to the standard of care for nurses than a nurse would be to offer an opinion as to the physician standard of care. *** Certainly, nurses are not permitted to offer expert testimony against a physician based on their observances of physicians or their familiarity with the procedures involved. An operating room nurse, who stands shoulder to shoulder with surgeons every day, would not be permitted to testify as to the standard of care of a surgeon. An endoscopy nurse would not be permitted to testify as to the standard of care of a gastroenterologist performing a Colonoscopy. A labor and delivery nurse would not be permitted to offer expert, opinion testimony as to the standard of care for an obstetrician or even a midwife. Nor would a nurse be permitted to testify that, in her experience, when she calls a physician, he/she usually responds in a certain manner. Such testimony would be, essentially, expert testimony as to the standard of medical care.”

Scholars share this reasoning:

“Physicians often have no first-hand knowledge of nursing practice except for observations made in patient care settings. The physician rarely, if ever, teaches in a nursing program nor is a physician responsible for content in nursing texts. In many situations, a physician would not be familiar with the standard of care or with nursing policies and procedures which govern the standard of care. Therefore, a physician’s opinions would not be admissible in jurisdictions which hold the expert must be familiar with the standard of care in order to testify as an expert. An example of a common situation which gives rise to allegations of nursing negligence occurs when a nurse fails to follow the institutional ‘chain of command’ in reporting a patient condition to a physician who subsequently refuses to attend to the patient condition. It is unlikely that a physician would be familiar with the policy and procedure involved in handling such a situation. It is as illogical for physicians to testify on nursing standard of care as it would be for nurses to testify about medical malpractice.” E. Beyer & P. Popp, 
Nursing Standard of Care in Medical Malpractice Litigation: The Role of the Nurse Expert Witness
, 23 J. Health & Hosp. L. 363, 365 (1990).

This scholarly insight has spread to litigators:

“Testimony from a physician about the standard of care may be subject to objection because the physician is not a nurse and does not have direct knowledge of nursing standards of care. A physician’s statement that he or she often observes nurses and therefore knows what they do may be inadequate.” P. Sweeney, 
Proving Nursing Negligence
, 27 Trial 34, 36 (May 1991).

Beyond scholars and litigators, courts have begun to accept this reasoning.

In some jurisdictions, “the physician is no longer permitted to testify about the nursing standard of care since the physician is not a nurse and does not possess direct knowledge of nursing standards.” F. Cavico & N. Cavico, 
The Nursing Profession in the 1990's: Negligence and Malpractice Liability
, 43 Clev. St. L. Rev. 557, 578 (1995); see 
Dolan v. Jaeger
, 285 A.D.2d 844, 846, 727 N.Y.S.2d 784, 786-87 (2001) (upholding trial court’s dismissal of nursing malpractice action where physician anesthesiologist was only expert to testify as to nurse’s standard of care); 
Vassey v. Burch
, 45 N.C. App. 222, 226, 262 S.E.2d 865, 867 (“Although the affidavit of [the physician] may be sufficient to establish the accepted standard of medical care for a doctor in his office, it does not establish the standard of care for a nurse in a hospital”), 
rev’d on other grounds
, 301 N.C. 68, 269 S.E.2d 137 (1980). According to one scholar:

“These cases represent a growing recognition on the part of courts that nursing, as a profession, has moved beyond its former dependence on the physician, and into a realm where it must and can legally account for its own professional practices. In doing so, the experts who provide the testimony, and the literature from which their opinions are derived, come from the nursing profession.” C. Kehoe, 
Contemporary Nursing Roles and Legal Accountability: The Challenge of Nursing Malpractice for the Law Librarian
, 79 Law Libr. J. 419, 428-29 (1987).

Based on this reasoning, AANA argues that Dr. Barnhart should not be permitted to offer expert testimony against nurse Lewis based on his observation of nurses.

We agree. By enacting the Nursing and Advanced Practice Nursing Act (225 ILCS 65/5–1 
et seq.
 (West 2000)), the legislature has set forth a unique licensing and regulatory scheme for the nursing profession. As AANA observes, under the nursing act, a person with a medical degree, who is licensed to practice medicine, would not meet the qualification for licensure as a registered nurse, nor would that person be competent to sit for the nursing license examination, unless that person completed an accredited program in nursing. See 225 ILCS 65/5–1 
et seq.
 (West 2000). The appellate court in this case correctly reasoned:

“Dr. Barnhart is not a licensed member of the nursing profession. To allow the doctor to testify as to the standard of care applicable to the nursing profession implicates the risks raised by 
Dolan
, namely, the imposition of a higher standard of care and the muddling and mixing of various tenets and practices unique to each profession.” 335 Ill. App. 3d at 272.

We uphold the trial court’s ruling on the competency of Dr. Barnhart to testify as to the standard of care for the nursing profession. We expressly reaffirm the license requirement of 
Dolan
 and its progeny and decline plaintiff’s invitation to deviate therefrom.

As a consequence of ruling that Dr. Barnhart was not competent to testify as to the standard of care for the nursing profession, the trial court entered a directed verdict in favor of the hospital. A directed verdict will be upheld where “all of the evidence, when viewed in its aspect most favorable to the opponent, so overwhelmingly favors movant that no contrary verdict based on that evidence could ever stand.” 
Pedrick v. Peoria & Eastern R.R. Co.
, 37 Ill. 2d 494, 510 (1967). A directed verdict in favor of a defendant is appropriate when the plaintiff has not established a 
prima facie
 case. A plaintiff must present at least some evidence on every essential element of the cause of action or the defendant is entitled to judgment in his or her favor as a matter of law. 
Nastasi v. United Mine Workers of American Union Hospital
, 209 Ill. App. 3d 830, 837 (1991). If the plaintiff fails to produce a required element of proof in support of her cause of action, then no cause is presented for the jury’s consideration and the entry of a directed verdict for the defendant is proper. 
Mayer v. Baisier
, 147 Ill. App. 3d 150, 155 (1986); see 3A Nichols Illinois Civil Practice §62:9 (rev. 2003).

In this case, plaintiff was required, and failed, to establish the applicable standard of care through the testimony of a medical expert. The only evidence plaintiff offered on this issue was the testimony of Dr. Barnhart, which the trial court properly struck. Therefore, plaintiff failed to establish a 
prima facie
 case of medical malpractice against the hospital through the acts of nurse Lewis. The trial court correctly determined as a matter of law that there was no evidentiary basis out of which the jury could have construed the necessary facts essential to recovery. See 
Jones
, 154 Ill. 2d at 47. We uphold the trial court’s directed verdict in favor of the hospital.

II. Jury Instruction on Proximate Cause

Plaintiff next contends that the trial court committed reversible error by giving the jury the long-form proximate cause instruction from Illinois Pattern Jury Instructions, Civil, No. 12.05 (2000). According to plaintiff, the evidence did not show another party to be the sole proximate cause of Burns’ injuries.

We need not address this contention, as it is waived. Supreme Court Rule 315(b)(3) requires a petition for leave to appeal to contain “a statement of the points relied upon for reversal of the judgment of the Appellate Court.” 177 Ill. 2d R. 315(b)(3). Rule 315(b)(5) requires the petition to contain “a short argument *** stating *** why the decision of the Appellate Court should be reversed or modified.” 177 Ill. 2d R. 315(b)(5). In this case, the “points relied upon for reversal” and “argument” sections of plaintiff’s petition for leave to appeal focused exclusively on the issue of the competency of Dr. Barnhart to testify as to the standard of care for the nursing profession.

Plaintiff concedes that she did not raise this issue in the petition for leave to appeal. However, in a footnote in her brief, plaintiff claims that 
Caveney v. Bower
, 207 Ill. 2d 82 (2003), allows her to assert this issue. We disagree. In 
Caveney
, the appellant 
did
 raise the contested issue in the petition for leave to appeal (
Caveney
, 207 Ill. 2d at 86-87), but here, plaintiff did not. It is quite established that issues not presented in the petition for leave to appeal are not properly before this court and are deemed waived. 
In re A.W.J.
, 197 Ill. 2d 492, 499 (2001) (and cases cited therein); 
Rodgers v. St. Mary’s Hospital
, 149 Ill. 2d 302, 313 (1992).

However, plaintiff invokes an exception to the waiver rule. Certainly, it is within our discretion to address the merits of an issue not properly raised in an appellant’s petition for leave to appeal. 
Deal v. Byford
, 127 Ill. 2d 192, 200-01 (1989). This court has explained that:

“the waiver rule is a principle of administrative convenience, an admonition to the parties; it is not a jurisdictional requirement or any limitation upon the jurisdiction of a reviewing court. In this regard, this court has recognized that a reviewing court may, in furtherance of its responsibility to provide a just result and to maintain a sound and uniform body of precedent, override considerations of waiver that stem from the adversarial nature of our system.” 
Dillon v. Evanston Hospital
, 199 Ill. 2d 483, 504-05 (2002).

Accord 
People v. Ward
, 113 Ill. 2d 516, 523 (1986), citing 87 Ill. 2d R. 366(a)(5).

In this case, we see no reason to override plaintiff’s waiver of this issue. The appellate court fully considered the question of whether the long-form proximate cause instruction was properly given to the jury. 335 Ill. App. 3d at 273-74. We therefore conclude that further review of this issue is unnecessary. See 
A.W.J.
, 197 Ill. 2d at 500; 
Ward
, 113 Ill. 2d at 523.

CONCLUSION

For the foregoing reasons, the judgment of the appellate court is affirmed.

Affirmed
.

JUSTICE RARICK, concurring in part and dissenting in part:

I concur with the majority’s holding that the trial court did not abuse its discretion in finding that plaintiff violated Supreme Court Rule 213(g) (177 Ill. 2d R. 213(g)), and in striking this portion of Dr. Barnhart’s testimony. However, I cannot agree with the majority’s conclusion that Dr. Barnhart was not competent to testify to the standard of care applicable to the nursing profession in this case.

The majority holds that this case “falls squarely within the license requirement of 
Dolan 
[
v. Galluzzo
, 77 Ill. 2d 279 (1979)]” (slip op. at 14), and rejects plaintiff’s reliance on 
Wingo v. Rockford Memorial Hospital
, 292 Ill. App. 3d 896 (1997), which set forth an exception whereby physicians may testify regarding “what a nurse is required to communicate to a physician.” 
Wingo
, 292 Ill. App. 3d at 906. While the majority finds that “the precise factual scenario of 
Wingo
” (slip op. at 14) is not present in the instant case, I believe that any factual distinctions are insignificant where the rationale behind the 
Wingo
 decision fully applies.

 While declining to address the merits of 
Wingo
, the majority notes 
Wingo
’s holding that the reason for the license requirement of 
Dolan
 is to
 “ ‘prevent a higher standard of care being imposed upon the defendant and to ensure the testifying expert has expertise in dealing with the patient’s medical problem and treatment and that the allegations of negligence are within the expert’s knowledge and observation.’ ” Slip op. at 14, quoting 
Wingo
, 292 Ill. App. 3d at 906. The majority also acknowledges that Dr. Barnhart has “substantial experience in observing and working with 
physicians
 
and nurses
 in the area of patient fall protection.” (Emphasis added.) Slip op. at 3. Therefore here, as in 
Wingo
, the concerns expressed in 
Dolan
 are not at issue because the record establishes that Dr. Barnhart’s particular expertise encompasses the proper standard of care for 
both
 physicians and nurses pertaining to patient fall protection. Thus, I would adopt the reasoning of 
Wingo
 which holds that the license requirements of 
Dolan
 do not apply where the allegations of negligence “do not concern an area of medicine about which there would be a different standard between physician and another school of medicine.” 
Wingo
, 292 Ill. App. 3d at 906.

For the foregoing reasons, I would hold that the circuit court erred in granting a directed verdict for the hospital because Dr. Barnhart was competent to testify as to nurse Lewis’ deviations from the proper procedures in the area of patient fall protection. The judgments of the appellate and circuit courts should be reversed in part. Accordingly, I respectfully dissent.